**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-220 (TJK)** |
| **v.** | : | |
| | : | |
| **BRANDON BRADSHAW,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Brandon Bradshaw to ten months' incarceration, one year of supervised release, 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution. The sentencing guidelines range for Bradshaw is eight to twelve months' imprisonment,[1] and the government's requested sentence falls at the midpoint of that range.

I.     **Introduction**

Defendant Brandon Bradshaw, a 42-year-old owner of a home improvement company and U.S. Army veteran, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[2]

[1] In the plea agreement, the parties agreed to an estimated guidelines range of 8 to 14 months. *See* ECF No. 24 ¶ 5 (Plea Agreement). However, the statutory maximum sentence for a violation of 18 U.S.C. § 1752(a)(2) is one year of imprisonment, and therefore, the effective guidelines range is 8 to 12 months' imprisonment. *See* U.S.S.G. § 5G1.1(c)(1).

[2] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States

Bradshaw pleaded guilty to disorderly conduct with an intent to disrupt government business, in violation of 18 U.S.C. § 1752(a)(2). The government recognizes that Bradshaw is a veteran and that he largely spent his time at the Capitol as a self-appointed (and unsuccessful) mediator between other rioters and the police. Nevertheless, as explained herein, a sentence of incarceration is appropriate in this case because: (1) Bradshaw was among the vanguard of rioters that overwhelmed police on the West Plaza, opening the floodgates to a mob that proceeded to storm the Capitol building; (2) while on the West Plaza, he grabbed and held onto an officer's baton; (3) he witnessed violence against police and ignored a wide array of unmistakable crowd control and dispersal tactics deployed by the police; (4) he engaged in violence against another rioter; (5) he was on the front lines of the second breach of the Senate Wing; (6) he witnessed other rioters breaking windows and then he himself entered the Senate Wing through a broken window; (7) he stayed inside the building for nearly an hour; (8) he was one of the last rioters to exit the Senate Wing before it was secured; (9) he lacked candor during his interviews with the FBI; (10) over three years after January 6, he continues to deflect blame, minimize, and lie about his own conduct; and (11) he has admitted that he acted with the intent to disrupt the peaceful transfer of power.

The Court must also consider that Bradshaw's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions

---

Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Bradshaw's crime support a sentence of ten months' incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol in the Statement of Offense. *See* ECF No. 25.

### *Defendant Bradshaw's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Bradshaw and his mother drove 1,600 miles to the Washington, D.C. area from San Antonio, Texas to protest Congress' certification of the Electoral College. *See* ECF No. 25 at 3 (Statement of Offense). Bradshaw packed food, water, a first aid kid, and a red bullhorn for the journey.

On the morning of January 6, 2021, Bradshaw—dressed in a blue neck gaiter, a "GOD GUNS TRUMP" hat, and a shirt that said "PATRIOTISM IS NOT A CRIME"—along with his mother boarded a shuttle at a nearby church. The shuttle dropped them off near the "Stop the Steal" rally at the Ellipse, at which the former President gave a lengthy speech.

After the former President finished speaking, Bradshaw and his mother walked with the crowd toward the Capitol building. During the walk, Bradshaw had his red bullhorn in one hand and a "TRUMP 2020 THE SEQUAL – MAKE THE LIBERALS CRY AGAIN" flag in the other:



*Image 1: Open-source photo of Bradshaw, circled in yellow, walking toward the Capitol*

By the time they reached the Capitol grounds, Bradshaw's mother had grown tired. So Bradshaw left her and continued to the Capitol building alone. By the time he arrived at the West Plaza, at approximately 2:00 p.m., the riot was in full swing. Undeterred by the chaos he saw unfolding before his eyes, Bradshaw weaved through the crowd and up to a line of police officers dressed in riot gear:



*Image 2: Screenshot of Exhibit 1 at 02:09 of Bradshaw standing against the police line on the West Plaza*

A pushing battle between the rioters and the police then ensued, with each side yelling "hold the line." Though it does not appear that Bradshaw was an instigator, another rioter nevertheless used Bradshaw's proximity to the police to his advantage by pushing Bradshaw into the line. *See* Images 3 and 4. At no point did Bradshaw instruct the rioter to stop pushing.



*Image 3: Screenshot of Exhibit 1 at 02:20 of another rioter pushing Bradshaw into the police line*



*Image 4: Screenshot of Exhibit 2 at 00:11 of Bradshaw being pushed into the police line*

Less than one minute later, Bradshaw grabbed the baton of the MPD officer directly in front of him and held onto it for approximately five seconds. The officer, already struggling to resist the crush of rioters, successfully wrested back control of the baton. Ironically, as Bradshaw held the officer's baton he shouted "we support the police" into his bullhorn. *See* Exhibit 1 at 02:48.



*Image 5: Screenshot of Exhibit 1 at 02:48 of Bradshaw holding onto an MPD officer's baton*

Bradshaw then took a few steps back and yelled "we're not against them" (*i.e.*, we're not against the police) at the other rioters. He then told the police that he loved and supported them.

At approximately 2:04 p.m., Bradshaw stood amid a more dispersed crowd on the West Plaza. At that time, MPD officers began repeatedly broadcasting a dispersal order to the crowd through a large speaker. The order began with two blaring tones, followed by a twenty-second announcement:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(a). All people must leave the area immediately. Failure to comply with this order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

*See* Exhibit 3 at 00:20–00:50, 01:10–1:30, 01:48–02:12.

After the dispersal order played for the third time, police officers sprayed a large cloud of tear gas into the northwest area on the West Plaza, where Bradshaw stood. When the air cleared, despite having suffered the effects of the chemical agent, Bradshaw did not retreat. Rather, open-source footage shows him once again directly in front of the police line, engaging with the police, on the south side of the West Plaza:



*Image 6: Screenshot of Exhibit 3 at 02:39 of Bradshaw at the front of the mob*

Over the next twenty minutes—before the rioters overtook West Plaza—Bradshaw maintained his position at the front of the mob. During this period, not only did he continue to ignore the dispersal order blaring across the West Plaza, but he also ignored direct orders from officers to move away from the police line. At one point, after an officer dressed in riot gear told him to step back, Bradshaw disregarded the order and instead took a selfie with the officer:



*Image 7: Selfie photo taken by Bradshaw on the West Plaza*

Less than ten minutes before the overtaking of the West Plaza, at approximately 2:21 p.m., Bradshaw violently shoved another rioter in the chest after hearing him refer to the police as traitors:



*Image 8: Screenshot of Exhibit 4 at 00:10 of Bradshaw shoving another rioter*

Bradshaw then went on a mostly unintelligible, belligerent rant about his love for his country and his military service. He told other rioters, including the man he had just shoved, that the police were just doing their jobs. And he compared the role of the police in that moment to his role in the military: "I killed mother fuckers. Was I doing my job? Yes!"[3] *See* Exhibit 4 at 00:10.

At approximately 2:28 p.m., the rioters succeeded in pushing back the police and overtook the West Plaza. Bradshaw then made his way to the Upper West Terrace. Along the way, he snapped a cheery selfie overlooking the hordes of people now covering the West Plaza:



*Image 9: Selfie of Bradshaw overlooking the West Plaza from the Upper West Plaza*

Bradshaw, with his blue neck gaiter covering his face, then walked over to the Senate Wing Door. There, he stood back and silently watched as other rioters broke windows, pushed against police officers blocking the doorway, and loudly chanted "stop the steal!" *See* Image 10.

---

[3] As discussed more *infra*, according to Bradshaw's own reporting, he served only six to seven months in the United States Army and was never deployed. PSR ¶ 79. According to Bradshaw's official military records, Bradshaw served in the military for less than two months. PSR ¶ 80.



*Image 10: Screenshot of Exhibit 5 at 00:07 of Bradshaw standing outside of the Senate Wing*

At approximately 2:48 p.m., after a prolonged battle between the police and rioters, the rioters forcibly breached the Senate Wing Door for a second time. Seconds later, Bradshaw entered the Senate Wing through the broken window adjacent to the Door:



*Image 11: Screenshot of Exhibit 6 at 00:18 of Bradshaw entering the Capitol building*

Bradshaw then spent the next hour milling about the Senate Wing corridor, all while alarms blared overhead. On several occasions, Bradshaw pestered the outnumbered and exasperated police officers for fist bumps and selfies:



*Image 12: Selfie taken by Bradshaw with an officer in the Senate Wing corridor*



*Image 13: Open-source image of Bradshaw requesting a fist-bump from a USCP officer*

At approximately 3:30 p.m., the police, now adequately reinforced, began clearing the Senate Wing for a second and final time. Though Bradshaw lingered, he did not resist. In fact, he told other rioters that it was time to leave because "**we did our job**," *i.e.*, they had stopped the certification of the Electoral College vote. *See* Exhibit 7 at 02:58. When other rioters told Bradshaw that they needed to get inside to speak to Lindsey Graham and Nancy Pelosi, Bradshaw assured the rioters that they were "gone." *See* Exhibit 7 at 06:01. Bradshaw exited the building at 3:44 p.m., having spent 56 minutes inside the Capitol building.



*Image 14: Screenshot of Exhibit 8 at 19:15 of Bradshaw, outlined in yellow, exiting the Capitol building through a Senate Wing Door*

### Bradshaw's Interviews with the FBI

On July 28, 2021, Bradshaw, accompanied by counsel, gave a voluntary, pre-arrest interview to the FBI. During the interview, Bradshaw confirmed that he was in Washington, D.C. on January 6, 2021, and attended the Stop the Steal rally. But he declined to answer when asked if he was at the Capitol.

On January 18, 2024, Bradshaw, per the terms of the plea agreement in this case, gave an additional interview to the FBI. *See* ECF No. 24 ¶ 2 (Plea Agreement). Bradshaw reported that he prepared for his trip to Washington, D.C. with his mother by packing food, water, a first aid kit, and a bullhorn. The pair drove to Washington, D.C. from San Antonio, Texas on January 5. On the morning of January 6, they boarded a shuttle at a local church that dropped them near the Stop the Steal rally on the Ellipse.

Following the former President's speech, Bradshaw and his mother walked toward the Capitol building. Bradshaw said that his mother grew tired from the walk, so she stopped to rest while he continued to the Capitol. In response to questions about why he continued on to the Capitol to that day, Bradshaw responded that *he merely wanted a tour of the building*.

When he reached the south side of the West Plaza, Bradshaw observed other rioters "acting aggressively and pushing officers." He then saw officers deploy tear gas into the crowd. After the tear gas cleared, he walked to the north side of the West Plaza, where he said he began "calling out" other rioters for acting violently.

When shown photos of his contact with the MPD officer's baton, Bradshaw gave the following explanation: he had asked the officer if he could shake his hand to thank him for his service, but the officer said that physical contact was prohibited. So Bradshaw decided to shake the officer's hand anyway. And because the officer had his hand wrapped around his baton, Bradshaw inadvertently made contact with the baton. Not only is Bradshaw's story unbelievable on its face, but it is also contradicted by body-worn camera ("BWC") footage. *See* Exhibit 1 at 02:46–02:52. The BWC footage does not show Bradshaw, at any point, asking the officer for a

handshake. Instead, it shows Bradshaw grabbing and holding onto the tip of the officer's baton with his right hand for five seconds while the officer resisted with his left hand.[4]

Bradshaw reported that later in the day, after witnessing other rioters breaking windows, he entered the Capitol building through a broken window. Once inside, he realized that he was "doing something wrong," but decided to stay to help get others out of the building. While inside, he said that he never heard anyone mention the names of any Congress members, but that he did hear a few people say negative things about former President Trump. The evidence, however, also contradicts this statement. As one example, open-source video shows that other rioters told Bradshaw they needed to speak with then-Speaker of the House Nancy Pelosi and Senator Lindsey Graham. Bradshaw told the other rioters that both Congress members had left. *See* Exhibit 7 at 06:01.

Bradshaw said that after he exited the Capitol building, he met his mother where he had left her several hours earlier. They then took the church shuttle back to his truck and drove home to San Antonio. Overall, Bradshaw felt that he was simply "*in the wrong place at the wrong time*" on January 6.

Bradshaw did not recall posting anything related to January 6 to social media before, during, or after the events of that day. However, it is notable that though Bradshaw was a prolific Facebook poster in the months before and after January 6, there is a conspicuous absence of posts on his Facebook page between January 3 and January 8.

---

[4] It goes without saying that it is not common practice to shake another's left hand. *See* "Handshake," https://en.wikipedia.org/wiki/Handshake ("In the United States a traditional handshake is firm, executed with the right hand, with good posture and eye contact.").

*The Charges and Plea Agreement*

On July 7, 2023, the United States charged Bradshaw via a four-count Information with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On December 1, 2023, pursuant to a plea agreement, Bradshaw pleaded guilty to Count Two of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(2).

## III.   Statutory Penalties

Bradshaw now faces a sentencing for a violation of 18 U.S.C. § 1752(a)(2). As noted by the plea agreement and the U.S. Probation Office, he faces up to one year of imprisonment and a fine of up to $100,000. Bradshaw must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

## IV.   The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government's sentencing guidelines calculation is as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.4(a)) | +10 |
| Specific Offense Characteristics (U.S.S.G. § 2A2.4(b)(1)) | +3 |
| Acceptance of Responsibility (U.S.S.G. § 3E1.1(a)) | <u>-2</u> |
| | |
| Total Adjusted Offense Level | 11 |

*See* ECF No. 24 ¶ 5 (Plea Agreement).

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 will be in effect at the time of sentencing in this matter but was not considered at the time the parties entered into the plea agreement.

Contrary to paragraph 63 of the PSR, Section 4C1.1 does not apply in this case because Bradshaw personally engaged in violent conduct, or at a minimum, used credible threats of violence, at least twice on January 6 in connection with his offense. In the first instance, Bradshaw grabbed an officer's baton and held on for nearly five seconds. *See* Exhibit 1 at 02:47–02:53. As he held on, rioters and the police officers were mid-push battle: rioters were pushing forward to break the line and the police were pushing back to hold it. *See United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 5-6 (defendant's conduct fell "within the plain meaning of 'violence'" because she shoved a police officer and aggressively pushed against the officer's baton). At a minimum, Bradshaw's grabbing the baton presented a credible threat of violence, particularly given that he did so in the midst of a battle between the rioters and police. *United States v. Andrulonis*, No. 23-cr-085 (BAH), Sentc'g Hrg. Tr. at 11-12 (Judge Howell explaining that "context" is critical[]" in "evaluating whether credible threats of violence were posed by the defendant's offense conduct," including "where [the defendant] was; what he was seeing; what a person would reasonably understand was the volatility of the situation; the threat that whole situation would pose to others; the foreseeable harm of the situation; and the consequences of the specific defendant's individualized actions."). Indeed, Bradshaw temporarily handicapped the officer, and the officer could have reasonably believed that Bradshaw intended to harm him. *Bauer*,

No. 21-cr-386-2 (TNM), ECF No. 195 at 6 (defining a "credible threat of violence" to mean "a believable expression of an intention to use physical force to inflict harm"). In a second act of violence when he seemingly blinded by rage, Bradshaw used both hands to forcefully shove another rioter in the chest, causing the blindsided man to stumble backwards and nearly fall over. *See* Exhibit 4 at 00:10.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[5]

The U.S. Probation Office calculated Bradshaw's criminal history as a category I, which the government does not dispute. PSR at ¶ 14. Based on the government's calculations, Bradshaw's total adjusted offense level, after acceptance, is 11 and his corresponding Guidelines imprisonment range is eight to twelve months.

---

[5] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under § 4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of ten months' incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Bradshaw's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

Bradshaw's conduct warrants incarceration. As Bradshaw approached the Capitol building, it was clear that the crowd was gearing up for violence on the West Plaza. Though Bradshaw at times made efforts to calm the crowd, those efforts were belied by his other actions, including his

decision to grab onto an officer's baton; to violently shove another rioter; to disregard violence against the police; to disregard direct orders from the police to back away from the police line; to disregard the blaring dispersal order and tear gas; to enter the Capitol building through a broken window, while alarms sounded overhead; and to remain inside the building for nearly an hour.

Bradshaw's post-January 6 conduct and statements have only further alarmed the government. First, as discussed *supra*, the evidence indicates that Bradshaw deleted relevant evidence from his Facebook. Second, during his most recent interview with the FBI, Bradshaw lied about, downplayed, and otherwise justified his conduct on January 6, going so far as to claim straight-faced that he merely went to the Capitol for a *tour*. His interview indicates that, three years on, he has *still* yet to fully accept responsibility for his actions.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Bradshaw's History and Characteristics

As set forth in the PSR, Bradshaw has no criminal history. PSR ¶ 13. Bradshaw reported to the PSR writer that he was a member of the United States Army for six to seven months between 2002 and 2003. PSR ¶ 79. According to Bradshaw, he was given an honorable medical discharge due to a pre-existing injury. *Id.* ¶ 80.

Bradshaw's official military records, which the government has provided to the PSR writer, tell a different story. First, Bradshaw was enlisted in the Army for 42 days before he was discharged under the separation code "JFW," which stands for "erroneous enlistment; medical condition disqualifying for military service, with no medical waiver approved." PSR ¶ 80. Second, because Bradshaw had less than 180 days of active service service, he was not eligible for an honorable discharge and instead received an uncharacterized discharge. *Id.*

20

Regardless, while Bradshaw's decision to join the military is laudable, it renders his conduct—storming a guarded government building—all the more concerning given his training. *United States v. St. Cyr,* 22-cr-00185 (JDB) (09/13/2023, Transc. at 44) ("Military service does warrant some respect and consideration and credit. On the other hand, military service should also be recognized as putting one in a position of taking an oath to the Constitution and having a responsibility to respect the law and to act accordingly. So it cuts both ways.").

The government is also alarmed by several false statements that Bradshaw made on January 6 regarding his service. Specifically, Bradshaw falsely told other rioters that he had been deployed abroad and that he "killed mother fuckers" during his time in the military. *See* Exhibit 4 at 01:44. As Bradshaw did not serve abroad, the government believes these were lies intended to impress other rioters. And in the government's view, given the ease with which Bradshaw deceived others about something as serious as military service, Bradshaw's credibility with respect to other statements he has made, as well as those he may make to this Court at sentencing, should be viewed with great skepticism.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on

our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of the requested term of incarceration.

Unlike many January 6 defendants, the government is not aware of any social media posts (or other public statements) made by Bradshaw regarding his actions on January 6. Based on Bradshaw's post-plea FBI interview and statement to the PSR writer, Bradshaw undoubtedly

regrets his actions insofar as they led to his arrest, his conviction, the disappointment of his family, and the loss of a financially lucrative contract. PSR ¶ 52. But Bradshaw also seems to be in complete denial that he knowingly and actively participated in a riot on January 6. That is evidenced by his reporting to the PSR rioter that he did not know he was violating any trespassing laws until after his arrest, as well as his statement to the FBI that he was just "in the wrong place at the wrong time" on January 6.

It is clear that three years after January 6 and nearly eight months after he was charged in this case, Bradshaw has yet to acknowledge the many deliberate choices *he* made to put *himself* in that place, at that time. Moreover, it is concerning that Bradshaw has not spared a single thought for the true victims of January 6: the police officers, members of our government and their staff, and the public more generally.

Thus, the government remains unconvinced that Bradshaw truly understands the gravity of his conduct, regrets his role in what transpired, or has gotten to the root of what within him led him to the Capitol that day. And with the 2024 presidential election approaching, and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms. The Court must sentence Bradshaw in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[6] This Court must

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL

sentence Bradshaw based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Bradshaw has pleaded guilty to Count Two of the Information, charging him with violating 18 U.S.C. § 1752(a)(2). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. In imposing a sentence, this Court must consider the sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. Bradshaw's plea to 18 U.S.C. § 1752(a)(2) results in a higher guidelines range than other misdemeanor defendants who have been convicted of violating 18 U.S.C. § 1752(a)(1) or committing Title 40 offenses.  It reflects the fact that his conduct was more aggravated that day, and he should be sentenced accordingly.  While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

First, in *United States v. Alford*, No. 21-cr-263 (TSC), Alford was convicted of four misdemeanor offenses following a jury trial: 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). The key differences between the cases largely balance each other out: Alford, unlike Bradshaw, went to trial, lied on the stand, and spread disinformation online, but Alford did not commit acts of violence, lie to the FBI, or delete evidence. And in other respects, the cases are similar: both Alford and Bradshaw repeatedly walked past and ignored signs that the

---

BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Capitol building and grounds were restricted, entered the Capitol while an alarm sounded, and refused to leave the Capitol building and grounds even after clear police orders to do so. Judge Chutkan sentenced Alford to the statutory maximum of 12 months' imprisonment, on the lower end of Alford's guidelines range of 10 to 16 months.

In *United States v. Rivera*, No. 21-cr-60 (CKK), Rivera was convicted of the same four misdemeanor offenses as in *Alford*, including 18 U.S.C. § 1752(a)(2). Like Bradshaw, Rivera was present for the breach of the police lines on the West Plaza and witnessed violence against the police. Both Bradshaw and Rivera entered the Senate Wing through a broken window immediately following the second breach of the Senate Wing Door. While Rivera remained inside the Capitol building for 20 minutes, Bradshaw stayed for 56 minutes. Unlike Bradshaw (at least to the government's knowledge), Rivera encouraged other rioters to climb the walls to the Upper West Terrace and celebrated the riot on social media, and failed to accept responsibility for his actions. But key to this case, Bradshaw, unlike Rivera, made physical contact with a police officer. Judge Kollar-Kotelly sentenced Rivera to eight months' incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Bradshaw must pay $500 in restitution, which reflects in part the role Bradshaw played in the riot on January 6.[8] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Bradshaw's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 129.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Bradshaw to ten months' incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Bradshaw's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      */s/ Madison H. Mumma*
Madison H. Mumma
Trial Attorney
NC Bar. No. 56546
601 D St. NW
Washington, DC 20004
(202) 913-4794
madison.mumma@usdoj.gov